**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| YEHUDA GOLDBERGER and FIREARMS POLICY COALITION, INC., <br><br> Plaintiffs, <br><br> v. <br><br> LETITIA JAMES, IN HER OFFICIAL CAPACITY AS ATTORNEY GENERAL OF NEW YORK, JESSICA TISCH, IN HER OFFICIAL CAPACITY AS NEW YORK CITY POLICE COMMISSIONER, and ALVIN BRAGG, IN HIS OFFICIAL CAPACITY AS DISTRICT ATTORNEY FOR NEW YORK COUNTY, <br><br> Defendants. | Case No. <br><br><br> **COMPLAINT** |

Yehuda Goldberger and Firearms Policy Coalition, Inc. ("FPC"), by and through counsel of record, bring this Complaint against Defendants, New York officials responsible for administering and enforcing the State's laws and regulations governing carriage of firearms in public in Times Square. In support of their Complaint against Defendants, Plaintiffs hereby allege as follows:

**INTRODUCTION**

1.     The Constitution guarantees "the right of the people to keep and bear Arms." U.S. CONST. amend. II. When the People enshrined in their governing charter the right to "carry weapons in case of confrontation," *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008), they did not leave the freedom to exercise that right at the mercy of the very government officials whose hands they sought to bind. Instead, "the right to keep and bear arms" ranks "among those fundamental rights necessary to our system of ordered liberty" and the Second Amendment

1

demands that "certain policy choices" are definitively "off the table." *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 778, 790 (2010) (quoting *Heller*, 554 U.S. at 636).

2.     On June 23, 2022, the United States Supreme Court held in *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), "consistent with *Heller* and *McDonald*, that the Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense *outside the home*," and accordingly declared New York's "proper cause" discretionary carry licensing scheme unconstitutional, *id.* at 10–11 (emphasis added).

3.     Just over a week later, on July 1, 2022, New York enacted sweeping new firearms restrictions to supplant those that the Supreme Court had invalidated. Those restrictions effectively nullify *Bruen*'s acknowledgment of a right to carry in public by declaring many public places "sensitive locations" where the carrying of firearms is unlawful even for individuals who are licensed consistent with state law.  As relevant to this case, New York banned carrying firearms in "the area commonly known as Times Square." N.Y. PENAL LAW § 265.01-e(2)(t) ("Times Square Carry Ban" or the "Ban"); *see also* N.Y.C. ADMIN. CODE § 10-315(a) (defining Times Square).

4.     The Times Square Carry Ban unlawfully deprives individuals of the right to keep and bear arms in what is indisputably a public place where the need for self-defense may arise. This makes a mockery of the Supreme Court's holding in *Bruen*, which reaffirmed that personal security extends to more than just "those . . . who work in marbled halls, guarded constantly by a vigilant and dedicated police force," *Peruta v. California*, 137 S. Ct. 1995, 1999 (2017) (Mem.) (Thomas, J., dissenting from denial of certiorari), to include ordinary, law-abiding Americans "outside the home," *Bruen*, 597 U.S. at 10.

5.     What is more, the Supreme Court in *Bruen* addressed the very justifications New York relies on in an attempt to support the Times Square Carry Ban. In the Supreme Court's

discussion of the historical limits it identified on the right, the Court rejected the idea that historical locational restrictions could be relied on to justify broadly limiting carry in New York City, explaining that "there is no historical basis for New York to effectively declare the island of Manhattan a 'sensitive place' simply because it is crowded and protected generally by the New York City Police Department." *Id.* at 31. While not designating the *entire* island a sensitive place, New York has done the next worst thing and declared a large portion and central thoroughfare of New York City a sensitive place based on that same rejected reasoning. *See id.*

6.      The Times Square Carry Ban stops ordinary, peaceable Americans from lawfully carrying firearms in a central area of Manhattan and functionally bars carry elsewhere (since if they are going to travel *through* Times Square, they need to disarm wherever else they go) and severely infringes the fundamental, individual right to bear loaded, operable handguns outside the home for millions of individuals who reside in New York City and the State more broadly, including the Plaintiffs, their similarly situated members, and others like them.

7.      To be sure, Plaintiffs acknowledge that the result they seek is contrary to *Frey v. City of New York*, 157 F.4th 118 (2nd Cir. 2025), but they believe that case was wrongly decided. They therefore institute this litigation to vindicate their rights as protected by the Second and Fourteenth Amendments and seek to have *Frey* overturned by a court competent to do so.

**PARTIES**

8.      Plaintiff Yehuda Goldberger is a natural person, an adult over the age of 21, a citizen of the United States, and a resident of Rockland County, New York. Plaintiff Goldberger is a law-abiding, responsible gun owner and is not prohibited under State or Federal law from acquiring or possessing firearms or ammunition. Plaintiff Goldberger is licensed to carry a handgun, which license was issued pursuant to New York law by the City of New York and the

3

County of Rockland. Plaintiff Goldberger is subject to Defendants' enforcement of the State's restrictions on his right to bear arms in public, including the Times Square Carry Ban. Plaintiff Goldberger is a member of Plaintiff FPC. Plaintiff Goldberger resides in Hillburn, New York 10931.

9. Plaintiff Firearms Policy Coalition, Inc. ("FPC") is a non-profit organization incorporated under the laws of Delaware with a place of business in Clark County, Nevada. The purposes of FPC include defending and promoting Second Amendment protected rights, advancing individual liberty, and restoring freedom. FPC serves its members and the public through legislative advocacy, grassroots advocacy, litigation and legal efforts, research, education, outreach, and other programs. FPC has members in the State of New York, including Plaintiff Goldberger, who are adversely and directly harmed by Defendants' enforcement of the Times Square Ban. The interests that FPC seeks to protect in this lawsuit are germane to the organization's purposes, and, therefore, FPC sues on behalf of its members, including Plaintiff Goldberger herein.

10. FPC recognizes that there is one line of Second Circuit precedent holding "that an organization does not have standing to assert the rights of its members in a case brought under 42 U.S.C. § 1983," *Nnebe v. Daus*, 644 F.3d 147, 156 (2d Cir. 2011), but notes that there is a second line of Second Circuit precedent reciting the Supreme Court doctrine that representational standing is available in Section 1983 cases, e.g., *Irish Lesbian & Gay Org. v. Giuliani*, 143 F.3d 638, 649 (2d Cir. 1998); *Citizens United to Protect Our Neighborhoods v. Vill. of Chestnut Ridge, N. Y.*, 98 F.4th 386, 395 (2d Cir. 2024). FPC contends that the former line of circuit precedent is erroneous, particularly in light of *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023) ("Either the organization can claim that it suffered an injury in its own

right or, alternatively, it can assert 'standing solely as the representative of its members.'" (quoting *Warth v. Seldin*, 422 U.S. 490, 511 (1975))), and that is has representational standing to assert its claim

11.    Regardless of the above, FPC can also bring a claim in equity under *Ex parte Young* on behalf of its members because it seeks only prospective relief to enjoin state violation of federal rights, and nominal damages, not compensatory damages.

12.    Defendant Letitia James is the Attorney General of the State of New York. As Attorney General, she exercises, delegates, or supervises the powers and duties of the New York State Department of Law, including the authority to enforce and defend New York's laws and regulations and to bring civil actions in the name of the State pursuant to New York Executive Law Section 63. Defendant James's official address is New York State Office of the Attorney General, The Capitol, Albany, NY 12224. Defendant James is sued in her official capacity.

13.    Defendant Jessica Tisch is the Police Commissioner of the City of New York. As Police Commissioner, she is "chargeable with and responsible for the execution of all laws and the rules and regulations of the [New York City Police] department." N.Y.C. CHARTER § 434(b). Accordingly, within New York City she is responsible for executing and enforcing New York's law and regulations governing the carrying of firearms in public. Defendant Tisch's official address is New York City Police Department, One Police Plaza Path, New York, NY 10038. Defendant Tisch is sued in her official capacity.

14.    Defendant Alvin Bragg is the New York County District Attorney and chief prosecutor of the county. Defendant Bragg "is the prosecutorial officer with the responsibility to conduct all prosecutions for crimes and offenses cognizable by the courts of the county in which he serves." *People v. Di Falco,* 44 N.Y.2d 482, 486 (N.Y. Ct. App. 1978); N.Y. COUNTY. LAW

§ 700(1). Defendant Bragg's official address is One Hogan Place, New York, NY 10013.

## JURISDICTION AND VENUE

15. This Court has jurisdiction over all claims for relief pursuant to 28 U.S.C. §§ 1331 and 1343.

16. Plaintiffs seek remedies under 28 U.S.C. §§ 1651, 2201, 2202, and 42 U.S.C. §§ 1983 and 1988, as this action seeks to redress the deprivation under color of the laws, statutes, ordinances, regulations, customs, and usages of the State of New York, of the rights, privileges or immunities secured by the United States Constitution.

17. Venue lies in this Court under 28 U.S.C. § 1391, as at least one Defendant is a resident of this District and the events giving rise to Plaintiffs' causes of action arose or exist in this District in which the action is brought.

## FACTS AND ALLEGATIONS COMMON TO ALL CLAIMS

### *The Second Amendment*

18. In *Bruen*, the Supreme Court explained that the "Second Amendment's plain text . . . presumptively guarantees . . . a right to 'bear' arms in public for self-defense." *Bruen*, 597 U.S. at 33. After all, "[m]any Americans hazard greater danger outside the home than in it." *Id.*

19. When regulating conduct that falls within the scope of the plain text of the Second Amendment, the government must "affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 19.

20. The Supreme Court has provided specific guidance to lower courts on principles that States may not rely on when enacting locational restrictions on firearm carriage. In particular, the Court made clear that the government cannot treat as sensitive "places where people typically congregate and where law-enforcement and other public-safety professionals are presumptively

6

available," *id.* at 30–31*,* (internal quotation marks omitted), because that would "define[] the category of 'sensitive places' *far too broadly*," and, effectively, "eviscerate the general right to publicly carry arms for self-defense." *Id*. at 31 (emphasis added).

### *New York's Regulatory Scheme*

21.   New York law forbids otherwise law-abiding, licensed firearm owners to "possess[] a firearm . . . in or upon a sensitive location" if "such person knows or reasonably should know such location is a sensitive location." N.Y. PENAL LAW § 265.01-e(1). Among those places New York law designates as a "sensitive location" is "the area commonly known as Times Square." *Id.* § 265.01-e(2)(t).

22.   New York City defines Times Square for the purposes of § 265.01-e(2)(t) as the:

> [T]ract in Manhattan, bounded and described as follows: (i) BEGINNING at the point of intersection of the north side of West Forty-eighth Street and the west side of Ninth Avenue; (ii) thence southerly along the west side of Ninth Avenue to the point of intersection where the west side of Ninth Avenue meets the south side of West Fortieth Street; (iii) thence easterly along the south side of West Fortieth Street to the point of intersection where the south side of West Fortieth Street meets the east side of Sixth Avenue; (iv) thence northerly along the east side of Sixth Avenue to the point of intersection where the east side of Sixth Avenue meets the north side of West Fifty-third Street; (v) thence westerly along the northern side of West Fifty-third Street to the point of intersection where the north side of West Fifty-third Street meets the west side of Eighth Avenue; (vi) thence southerly along the west side of Eighth Avenue to the point of intersection where the west side of Eighth Avenue meets the north side of West Forty-eighth Street; and (vii) thence westerly along the north side of West Forty-eighth Street until the point of intersection where the north side of West Forty-eighth Street meets the west side of Ninth Avenue (the point of beginning). Where the area described in this subdivision is bounded and described by a side of a street or avenue, it shall be deemed to include the sidewalk of such side.

N.Y.C. ADMIN. CODE § 10-315(a). A map of the Times Square "sensitive location" is attached as Exhibit A.

23.   Violating the Times Square Carry Ban is a class E felony, punishable by a fine of up to $5,000 or between one and four years of imprisonment. N.Y. PENAL LAW §§ 70.00(2)(e) &

7

3(b), 80.00(1), 265.01-e.

24.     In addition to imposing serious criminal penalties, a violation can also result in a ban on the future exercise of the right to keep and bear firearms under state and federal law. *See* N.Y. Penal Law § 265.01(9);18 U.S.C. § 922(g)(1).

25.     The Times Square Carry Ban is utterly incompatible with the Second Amendment's text and cannot be "justif[ied]" as "consistent with the Nation's historical tradition of firearms regulation." *Bruen*, 597 U.S. at 24.

26.     The historical principle uniting the places that *Bruen* assumed were sensitive at the Founding—courthouses, legislatures, and polling places—was the presence of security that actually functioned to prevent individuals from carrying firearms. *See* Stephen P. Halbrook, *Sensitive Places Require Government-Provided Armed Security* (Feb. 11, 2026), https://perma.cc/X3W7-PDRU; Angus McClellan, *The Second Amendment, Sensitive Places, and Comprehensive Government Security* (Jan. 20, 2026), https://perma.cc/NN4K-Q7UD. No place where legislators banned firearms contemporaneous with our Founding lacked such security, and where they wanted to protect a location and could not provide security, their solution was not to erect a useless paper barrier—or metal sign—that would never stop an armed criminal intent on violence, *see* Mark W. Smith, *Enlightenment Thinker Cesare Beccaria and His Influence on the Founders: Understanding the Meaning and Purpose of the Second Amendment's Right to Keep and Bear Arms,* 2020 PEPP. L. REV. 71, 83 (2020), but rather to oblige law-abiding citizens to carry firearms for everyone's protection, *see* David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine: Locational Limits on the Right to Bear Arms*, 13 CHARLESTON L. REV. 203, 232–34 & n.108, 244 (2018). What is more, the well-established limit at the Founding was, in places of public congregation such as Times Square, to bar only carry with the *intent* to terrify.

*See Bruen*, 597 U.S. at 45.

27.     Times Square is a large and arbitrarily designated group of city blocks contiguous with and hardly distinguishable from any other city blocks in Manhattan. It has no special or designated entry points and there is no screening of individuals who enter Times Square because Times Square is like other city streets. *See Bridgeville Rifle & Pistol Club v. Small*, 176 A.3d 632, 659 (Del. 2017).

28.     Although the Supreme Court has indicated it is irrelevant to the Second Amendment analysis, it is noteworthy that other areas of Manhattan experience comparable pedestrian activity, including the Midtown Fifth Avenue commercial corridor, and during certain times of year experience even higher peak crowds. *See Mayor Adams, Future of Fifth Partnership Unveil Transformation of Fifth Avenue Into World-Class, Pedestrian-Centered Boulevard*, OFF. N.Y.C. MAYOR (Oct. 17, 2024), https://perma.cc/45H3-B53X ("70 percent of the people on Fifth Avenue are pedestrians. . . . On the holidays, that's 23,000 people every hour — 4,000 more than a packed MSG — cramming like sardines into constrained sidewalks."); *5th Avenue Complete Street: Presentation to Community Board 5* at 13, N.Y.C. DEP'T OF TRANSP. (Aug. 24, 2020), https://perma.cc/Y3Z2-5SH9   (stating 5th Ave. weekday evenings average "7,000-10,000 [pedestrians] per hour," and "Holiday counts reach 30,000+ pedestrians per hour."); Andrew Rosenberg, *Mind-Blowing Facts About the Rockefeller Center Christmas Tree*, N.Y.C. TOURISM + CONVENTIONS (updated Oct. 31, 2025), https://perma.cc/8FTJ-S6S6 ("[O]rganizers estimate around 750,000 people come by per day to visit the tree.").

29.     Further to that point, Times Square crime statistics do not differ meaningfully from comparable commercial districts or from the rest of Manhattan. *See CompStat 2.0*, NYPD, http://bit.ly/4bijgSV (selecting on the interactive map the period "Year to Date" and the area as

"Citywide" or "Manhattan South," which includes comparable districts such as Midtown Fifth Avenue and Rockefeller Center, Herald Square and Penn Station, and Hudson Yards, and selecting the crime statistics for "Felony Assault" or "Misd. (misdemeanor) Assault" shows an incident distribution in which comparable areas around Manhattan have at least as many incidents reported as Times Square. The same is true for other crimes such as grand larceny and petit larceny). Despite the Times Square Carry Ban, violent crime, including shootings, occurs in Times Square, including as recently as last month, further underscoring law-abiding residents' acute need to carry arms in case of confrontation. *See* Chelsia R. Marcius et al., *Man Is Fatally Shot at 7-Eleven Near Times Square,* N.Y. TIMES (Feb. 12, 2026), https://perma.cc/4W7K-SGU4; Tina Moore et al., 3 *people shot – including tourist – after teen gunman opens fire in Times Square*, N.Y. POST (Aug. 9, 2025), https://perma.cc/Y9DR-SX2U.

30.    Before the Supreme Court's decision in *Bruen*, New York law did not treat Times Square as a distinct, specially designated "sensitive location" nor otherwise impose heightened carry restrictions distinct from the rest of New York City.

31.    Because Times Square is a major thoroughfare, not only is the Ban historically unsupportable, but its effects extend far beyond Times Square. Individuals who are otherwise eligible to carry firearms in public and who are traveling to and from locations where they are allowed to carry and possess those firearms even under New York's sever restrictions, are forced to disarm themselves and not exercise their constitutional right to carry firearms for lawful purposes if their daily activities will take them to or through the area defined by the Ban as Times Square.

### The Times Square Ban's Effect on Plaintiffs

32.    Plaintiff Goldberger is presently licensed under New York law to carry a concealed

firearm in New York City. Goldberger desires to—and regularly does—carry his firearm for self-defense when going about his day-to-day life.

33.     Goldberger works as an executive assistant, and his work takes him through Times Square. Additionally, Goldberger walks through or visits Times Square several times per year. Because of the Times Square Carry Ban, Goldberger is forced to disarm whenever his work may take him to or through the area the Ban defines as Times Square. Goldberger would carry a firearm for self-defense in the area the Ban defines as Times Square but for the Defendants' enforcement of the Times Square Carry Ban.

34.     The challenged Times Square Carry Ban operates to deny Goldberger and other similarly situated FPC members who are typical law-abiding individuals from carrying loaded, operable handguns on their person in case of confrontation for immediate self-defense in public spaces, both in Times Square and beyond it.

**COUNT ONE**
**DEPRIVATION OF CIVIL RIGHTS**
**RIGHT TO KEEP AND BEAR ARMS**
**U.S. CONST., AMENDS II AND XIV**
**(42 U.S.C. § 1983)**

35.     Plaintiffs incorporate herein by reference the foregoing paragraphs as if fully set forth herein.

36.     There is an actual and present controversy between the parties.

37.     Defendants are implementing and will enforce the onerous and burdensome Times Square Carry Ban—N.Y. PENAL LAW § 265.01-e(2)(t)—and all related regulations, policies, and enforcement practices, which individually and collectively, unconstitutionally burden, delay, chill, and/or deny law-abiding people, like and including Goldberger and FPC's similarly situated members, the exercise of their fundamental, individual right to bear arms.

38.    Goldberger and FPC's similarly situated members desire to exercise their right to bear arms by carrying in public for lawful purposes, including immediate self-defense in case of confrontation. "The Second Amendment's plain text . . . presumptively guarantees" Plaintiffs' "right" to do so. *Bruen*, 597 U.S. at 33. In particular, Plaintiff Goldberger desires to carry a loaded, operable firearm for immediate self-defense in case of confrontation in Times Square, and he would do so, but for his reasonable fear of Defendants' enforcement and threatened enforcement of New York's law, which could lead to his arrest and prosecution, and if convicted, the loss of his rights

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for the following relief:

1.    A declaratory judgment that N.Y. PENAL LAW § 265.01-e(2)(t) (Times Square), and Defendants' enforcement thereof, infringe upon Plaintiffs' right to bear arms protected under the Second and Fourteenth Amendments to the United States Constitution, both facially and as-applied;

2.    Injunctive relief restraining Defendants and their officers, agents, servants, employees, and all persons in concert or participation with them who receive notice of the injunction, from enforcing N.Y. PENAL LAW § 265.01-e(2)(t), and their regulations, policies, and practices implementing it;

3.    Plaintiffs' attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and any other applicable law; and

4.    All other and further legal and equitable relief, including injunctive relief, against Defendants as necessary to effectuate the Court's judgment and/or as the Court otherwise deems just and equitable.

Dated: March 20, 2026

Respectfully submitted,

/s/ Peter A. Patterson
Peter A. Patterson†
William V. Bergstrom *
Alfonso Gamboa*
COOPER & KIRK, PLLC
1523 New Hampshire Ave. NW
Washington, D.C. 20036
Tel: (202) 220-9600
Fax: (202) 220-9601
ppatterson@cooperkirk.com
wbergstrom@cooperkirk.com
agamboa@cooperkirk.com

*Counsel for Plaintiffs*

† Motion to appear *pro hac vice* filed
simultaneously with this Complaint.

*Motion to appear *pro hac vice* forthcoming

13